## No. 29,436.

E. J. STURM and J. H. FRANDLE, *Appellants,* v. THE CONTINENTAL OIL COMPANY, *Appellee.*

(292 Pac. 774.)

Opinion filed November 8, 1930.

*A. C. Wilson,* of Oskaloosa, for the appellants.

*Lloyde Morris,* of Oskaloosa, *Charles W. Blackmar* and *Roy P. Swanson,* both of Kansas City, Mo., for the appellee; *E. C. Meservey, W. C. Michaels, C. M. Blackmar, S. D. Newkirk, H. I. Eager,* all of Kansas City, Mo., and *R. F. Armstrong,* of Ponca City, Okla., of counsel.

The opinion of the court was delivered by

BURCH, J.: The action was one by lessors of land, let for use by the lessee as a filling station, to recover rent from an oil company which sold gasoline to the lessee. The verdict and judgment were for defendant, and plaintiffs appeal.

E. J. Sturm and J. H. Frandle were lessors, and C. C. Peppard was lessee. The lease was in writing, and was signed by the parties on May 15, 1926. The land consisted of an acre of ground at the intersection of two highways. The term was three years, with privilege of the lessors to extend it for two more years. The rent was one cent per gallon, meter measure, for all gasoline sold at the station, payable monthly. Nothing was done pursuant to the lease for a number of months after it was executed.

The Continental Oil Company's general office was at Denver, Colo. Applications for installment of tank and pump equipment for filling stations were made to and approved at the general office. The company had a division office at Kansas City, Mo., which was in charge of a division manager. Applications for establishing stations were made to and were approved at the division office. The company had a district office at Lawrence, Kan., in charge of a district superintendent. The district comprised the counties of Douglas, Franklin and Johnson, and parts of the counties of Miami and Shawnee. W. L. Bradley was district superintendent. He was a sales manager for his district, and with respect to filling stations he had authority to locate stations, estimate gallonage, and submit applications for establishment of stations to the Kansas City office for final approval. Roy Porter was an assistant salesman. He sold gasoline, performed some other duties under Bradley's directions, and reported to Bradley. He had the title of assistant district superintendent. W. O. Gibson was a tank-truck driver who delivered gasoline to filling stations. George M. Dohn did the work of installing tank and pump equipment in filling stations.

In February, 1927, Peppard discussed with Bradley the subject of establishing a station on the leased land. The result was, on February 21 Peppard made written application for a station, which was forwarded to and was approved by the division office at Kansas City. On February 25 Peppard made written application for tank and pump equipment, which was forwarded to the general office at Denver, and was there approved on March 4. Peppard proceeded to

erect the station, and in March, before the tank and pump equipment was installed, he made an oral agreement with Bradley and Porter concerning sale of the company's products to Peppard. The arrangement was that Peppard was to sell the oil company's products. He was to pay cash for gasoline at time of delivery. The company was to pay him a discount of two cents per gallon on the tank-wagon price. He was not to receive any other discount from the company. He purchased, however, at quantity discount prices, and was allowed price discounts of two cents and one cent, taken off at time of delivery.

The tank and pump equipment was installed in March by Dohn, who made a written construction-job report of the installation. After completion of the station Peppard commenced to operate it. He purchased gasoline, which was delivered from Lawrence by Gibson. Peppard paid Gibson, Gibson took the money to the Lawrence office, and once a month the Kansas City office forwarded checks to the Lawrence office for Peppard's discount. Peppard became indebted to the company, and to reduce the amount of his indebtedness the company applied one cent of the discount on his account. This was in 1927. Later the other one cent was also applied on the account. The testimony for the company was that at the time of trial Peppard owed the company approximately $275. Peppard testified he did not know whether he owed the company or not.

The lease from plaintiffs to Peppard contained the following provisions:

"Parties of the first part are to receive one cent per gallon for all gasoline sold at said filling station. The same to be measured by the meter measure at said filling station, and payment of said one cent per gallon to be made through or by the oil companies furnishing gas at said filling station, payments to be made monthly; . . .

"No other rent shall be paid or required to be paid to the parties of the first part, except those rents and benefits herein mentioned. . . . It is the intention of this lease that the party of the second part shall lease one acre of ground in the place described herein for the purpose of erecting and maintaining a filling station, and that the parties of the first part shall receive as pay therefor one cent per gallon for the privilege granted to second party of erecting and maintaining said filling station for the period of three years, [and] if agreeable to the parties of the first part, for five years. . . .

"Party of the second part agrees that the oil companies furnishing the gas for said premises shall pay or cause to be paid to the parties of the first part the one cent per gallon for the gasoline sold at said filling station according to the meter measure, he paying said companies the one cent at time of payment for gas used."

Plaintiffs sued the oil company for rent in the sum of $248.71, a sum equal to one cent per gallon for 24,871 gallons of gasoline delivered at the Peppard station during the period, February 1, 1928, to February 17, 1929.

Plaintiffs claim the oil company became a party to the lease in this way. After the station building was erected, but before the tanks and pumps were installed, Sturm exhibited the lease to Porter at Lawrence, and Porter, as managing agent for the company, accepted and approved the lease and agreed to comply with its provisions. The amended bill of particulars on which the case was tried also alleged that the oil company agreed with Peppard to pay the rent as provided in the lease. The lease was for three years with privilege of five, was not signed by the party to be charged in this action, and the provision for payment of rent could not be performed within a year. Porter's acceptance and approval of the lease and promise to comply with its terms were oral. Peppard testified his agreement with Bradley and Porter relating to purchase of gasoline was reduced to writing, but the writing was never signed. The answer of the oil company presented the defense of the statute of frauds, and the court refused to give certain instructions requested by plaintiffs embodying a theory of the case which would avoid operation of the statute.

In support of their theory plaintiffs cite the familiar decisions that when parties agree on the terms of a contract, reduce the agreement to writing, and the writing is signed by one of the parties only, but the other fully recognizes the agreement and acts on it, there is a contract binding on both. This is true, and the reason is, the party who did not sign manifested his assent as effectively as if he had signed the writing. This does not, however, satisfy the statute of frauds in those cases in which it is necessary to maintenance of an action on the contract that there should be a writing signed by the party to be charged.

Plaintiffs cite the familiar decisions to the effect that a grantee who accepts a deed signed by the grantor only is bound by covenants of the grantee contained in the deed. Plaintiffs also cite the decisions holding that a lessee, or a lessee's assignee, who accepts a lease signed by the lessor only, and takes possession of land under the lease, is bound by covenants of the lessee contained in the instrument. None of these decisions, all of which relate to land, has any application to the present controversy. The oil company ac-

quired no estate or interest in the land from either lessors or lessee by agreeing to satisfy the provisions of the lease relating to how rent should be paid, and the oil company remained a stranger to the lease as a lease of land.

Sturm went to Lawrence and had an interview with Porter. Nobody else was present, and the following is the testimony relating to creation of an obligation of the company to the lessors to pay rent:

"I gave Porter the original lease, the one that is identified here. He read it. He said that he understood it, that it was the same as Peppard had. He said it was all right, after he read the lease."

The strongest interpretation in favor of plaintiffs, of what Porter said, would be that the oil company assumed an obligation to pay money or cause money to be paid. If the promise was one to answer for the debt or default of Peppard it was unenforceable because of the statute of frauds. Plaintiffs cite authorities to sustain the contention that the promise was a distinct and independent assumption of the debt. If this be conceded, the promise was unenforceable. It could not be performed within a year, and the same was true of the agreement of the company with Peppard. A verbal promise to pay money which cannot be fully performed within a year is within the statute. This is true with regard to verbal promises to pay money in installments for a fixed period of years (27 C. J. 185), and the doctrine of part performance does not apply to such agreements. (*Osborne v. Kimball*, 41 Kan. 187, 21 Pac. 163; *Thisler v. Mackey*, 5 Kan. App. 217.)

Departing from the theory of the amended bill of particulars, which stated a cause of action on an express contract, plaintiffs propose the theory of a fund placed in the hands of a third person by a debtor to pay the debtor's creditors. The lease specifically provided that Peppard would pay to the company furnishing gasoline the one cent per gallon rent at the time of payment for gasoline used. There was neither allegation nor proof that Peppard ever performed this condition precedent to liability of the company and so created a fund in possession of the oil company with which to pay rent. All Peppard ever did was to pay the tank-wagon C. O. D. price for gasoline.

While the foregoing makes it impossible for plaintiffs to recover, some claims of error relating to the subject of instructions to the jury may be noticed.

Porter testified he did not tell Sturm the lease was satisfactory and Sturm would get the one cent per gallon. Porter did not read the lease, and he told Sturm the lease did not concern him.

The oil company denied that Porter had any authority to bind the company to pay rent for a customer's filling station, and produced abundant evidence to show Porter had no such authority, express or implied. The court instructed the jury that if Porter had authority to accept and approve the lease, the verdict should be for plaintiffs. The court refused, however, to instruct the jury on the subject of whether the oil company clothed Porter with apparent authority to make the verbal agreement with Sturm, evidently because the court was of the opinion there was no substantial evidence of apparent authority.

Plaintiffs testified they saw Porter driving a Ford coupé having on the vehicle the oil company's sign or emblem containing the company's name. Since the automobile has become a necessity to the conduct of business, the general practice is for individuals, partnerships and corporations doing business to place this kind of advertising matter on their vehicles. By doing so they give no indication of authority of vehicle drivers to make important business contracts for their employers.

When Sturm went to Lawrence he went to the company's office in Lawrence and asked for the "manager." Some one "in charge" of the office said Porter was manager—referred Sturm to Porter. Bradley was not there, and Sturm did not say Porter was present. Sturm gave no description of the office which would give any clue to the nature of the business transacted there. So far as the evidence discloses, the office may have been in a filling station. Sturm told nothing of the relation to the office surroundings of the person who referred him to Porter. So far as the testimony discloses, the person may have been a clerk, or stenographer or janitor. A "manager" with general authority to bind a company by a contract of the kind here involved may not be created in that way. Concede, however, that Sturm might reasonably believe Porter was manager of the company at the Lawrence office. The function of a manager is to carry on whatever business may be confided to him, and not to make contracts against his employer's interest. The lease had been effective as a lease for months before Sturm went to Lawrence. On the face of the lease the only interest of an oil company in the station would be that the company might market its products there. A

promise to become responsible for the rent of the station would not increase the quantity of gasoline to be sold by a single gallon or increase the price by a fraction of a penny. On the other hand, such a promise would necessarily impose on the oil company the burden of accounting and making remittances.

"An act is within the apparent scope of an agent's authority when a reasonably prudent person, having knowledge of the nature and usages of the business, is justified in supposing that he is authorized to perform it, from the character of the duties which are known to be intrusted to him." (*Townsend v. Railway Co.*, 88 Kan. 260, syl. ¶ 2, 128 Pac. 389.)

In this instance plaintiffs had no knowledge of the usages or methods of an oil company in handling its business, had no knowledge of the relation of such business to the filling station business, had no knowledge of any business transacted or act performed by Porter for the company indicating authority, and under the evidence there was no basis for a reasonable inference that Porter did possess the authority attributed to him.

After the promise had been made on which liability of the oil company was predicated, plaintiffs said they saw Porter directing the men who were installing the tanks and pumps at Peppard's station. The promise was not accepted in reliance on this display of authority, and the fact that Porter had the authority of a tank and pump setter did not imply that he had previous authority to bind the company by a promise which went beyond guaranty, and constituted an outright gratuitous assumption of a third person's debt.

Plaintiffs pleaded that the company ratified Porter's agreement to pay rent, and the court instructed the jury on the subject of ratification. Part of plaintiffs' evidence relating to ratification consisted of Porter's conduct. The court properly instructed the jury substantially to the effect that ratification must be by an agent having authority to ratify, and Porter could not ratify his own unauthorized act. The issue respecting ratification was determined adversely to plaintiffs by the verdict.

The judgment of the district court is affirmed.

HARVEY, J., concurring in the judgment of affirmance.
HUTCHISON, J., not sitting.